**SIERRA CLUB, Friends of the Boundary Waters Wilderness, Defenders of Wildlife, and Minnesotans for Wilderness, Plaintiffs,**

v.

**Abigail R. KIMBELL, Chief of the United States Forest Service, and Ed Schafer, Secretary of Agriculture,[1] Defendants,**

**Minnesota Forest Industries, Inc., Minnesota Timber Producers Association, All Terrain Vehicle Association of Minnesota, BlueRibbon Coalition, and Lake County, Intervenor Defendants.**

Case No. 06–CV–3334 (PJS/RLE).

United States District Court,
D. Minnesota.

Jan. 20, 2009.

1. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the caption has been amended to (1) substitute current Chief of the United States Forest Service Abigail R. Kimbell for her predecessor, Dale Bosworth, and (2) substitute current United States Secretary of Agriculture Ed Schafer for his predecessor, Mike Johanns.

Sanne H. Knudsen, Brian B. O'Neill, and Richard A. Duncan, Faegre & Benson, LLP; Sierra Weaver, Defenders of Wildlife, for plaintiffs.

Rachel A. Dougan and Ronald J. Tenpas, U.S. Department of Justice, Environment and Natural Resources Division; Gregory G. Brooker, United States Attorney's Office, for defendants.

Paul A. Turcke, Moore Smith Buxton & Turcke; Patrick D. Robben, Morrison Fenske & Sund, P.A., for intervenor defendants All Terrain Vehicle Association of Minnesota and BlueRibbon Coalition.

David R. Oberstar, Fryberger, Buchanan, Smith & Frederick, P.A., for intervenor defendants Minnesota Forest Industries, Inc., and Minnesota Timber Producers Association.

Ryan L. Woody, Matthiesen, Wicker & Lehrer, S.C.; Charles James Suk, Suk Law Firm Ltd., for amicus curiae the Ruffed Grouse Society.

Lori Swanson and David P. Iverson, Minnesota Attorney General's Office, for amicus curiae Mark Holsten, as Commissioner of the Minnesota Department of Natural Resources.

## MEMORANDUM OPINION AND ORDER

PATRICK J. SCHILTZ, District Judge.

Plaintiffs (collectively, "the Sierra Club") brought this action to challenge decisions of the United States Forest Service regarding the management of the Superior National Forest. The Court has already dismissed Counts I and II of the Sierra Club's complaint, which raised challenges under the National Forest Management Act of 1976 ("NFMA"), Pub. L. 94–588, 90 Stat. 2949 (codified mainly at 16 U.S.C. §§ 1600–1614). Mem. Op. & Order, Nov. 15, 2007, 2007 WL 4050102 [Docket No. 107]. The two remaining claims, Counts III and IV of the complaint, allege that the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f, in revising the forest plan for the Superior National Forest.[2]

The Sierra Club moves for summary judgment. The government cross-moves for summary judgment, as do intervenors representing the timber industry (collectively, "MTPA"). For the reasons that follow, the Court denies the Sierra Club's

---

**2.** Forest plans are formally called "Land and Resource Management Plans." The Court uses the shorter and more evocative (though slightly less accurate) term "forest plan."

motion and grants the motions of the government and the MTPA.

## I. BACKGROUND

The facts are essentially undisputed. The Superior National Forest is an area of over three million acres located in Northern Minnesota. The Boundary Waters Canoe Area Wilderness ("BWCAW") is located within the Superior National Forest and takes up about one-third of the forest's total area.

Congress established substantive directions for the management of national forests in NFMA. Congress established procedural rules for how federal agencies should assess the environmental impacts of certain activities in NEPA. National forests such as the Superior National Forest are managed by the United States Forest Service in accordance with forest plans that must comply with the substantive dictates of NFMA and the procedural dictates of NEPA. The BWCAW is subject to additional standards set forth in the Wilderness Act, Pub. L. 88–577, 78 Stat. 890 (1964) (codified as amended at 16 U.S.C. §§ 1131–36) and the Boundary Waters Canoe Area Wilderness Act, Pub. L. 95–495, 92 Stat. 1649 (1978) (amending the Wilderness Act).

Under NFMA, creating a forest plan is only the first stage of a two-stage planning process for forest management. A forest plan is a "general planning tool" that "provides guidelines and approved methods by which forest management decisions are to

be made. . . ." *Sierra Club v. Robertson*, 28 F.3d 753, 758 (8th Cir.1994). A forest plan does not, however, authorize any particular site-specific activities. *Id.* Such site-specific activities, which are themselves subject to NFMA and NEPA, must be separately authorized at the second stage of forest planning. *Id.* This case does not involve any proposed site-specific activities.

The Forest Service adopted the first forest plans for the Superior National Forest and the nearby Chippewa National Forest in 1986. Forest plans are generally revised every ten to fifteen years, and in 1997, the Forest Service announced its intention to revise the forest plans and solicited public input. *See* 16 U.S.C. § 1604(f)(5)(A) (providing that forest plans must be revised "from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years"). Six years later, in 2003, the Forest Service issued a draft Environmental Impact Statement ("EIS") discussing the likely environmental effects of various proposed approaches to managing the two forests. Draft EIS, April 2003 (AR 18008).[3] Members of the public, including some of the plaintiffs in this case, commented on the draft EIS.

After considering the comments, the Forest Service issued three related documents in July 2004: a final EIS ("FEIS") (AR 18028), a Record of Decision ("ROD") (AR 18032), and a revised forest plan (AR 18035 (Superior National Forest)).[4] The

---

**3.** The government filed conventionally a set of optical disks (CDs and DVDs) containing the administrative record in this case, which includes the revised forest plan and all related documentation [Docket No. 42]. Each document bears an Administrative Record ("AR") number that can be used to locate a particular document on the disks. Documents are identified by name in this opinion, but the first citation of each document will provide its AR number.

**4.** The FEIS was accompanied by a summary (AR 18031) and appendices (AR 18029–18030). The Forest Service also issued in July 2004 an ROD with respect to the Chippewa National Forest (AR 18034) and a revised forest plan for that forest (AR 18034). The forest plan for the Chippewa National Forest is not at issue in this action.

FEIS identifies seven alternative approaches to managing the Chippewa and Superior National Forests and analyzes the likely impacts of each approach on the environment.[5] The ROD identifies which of those seven alternative approaches the Forest Service ultimately chose to govern management of the Superior National Forest. And the forest plan describes in detail how the forest will be managed under the approach identified in the ROD. Although the Forest Service issued a single FEIS for the Chippewa and Superior National Forests, it issued separate RODs and adopted separate forest plans. The Sierra Club challenges only the FEIS with respect to the forest plan for the Superior National Forest.

In November 2004, in accordance with Forest Service regulations, the Sierra Club administratively appealed the Forest Service's adoption of the revised forest plan. Notice of Appeal, Nov. 26, 2004 (AR 18127).[6] The Forest Service rejected the appeal (along with appeals filed by others) in August 2005. Appeal Decision, Aug. 8, 2005 (AR 18144).[7] The Sierra Club filed this suit a year later.

Since filing suit, the Sierra Club has narrowed its challenge to two basic arguments. First, the Sierra Club contends that the FEIS for the forest plan does not adequately consider the effects on the BWCAW of managing the surrounding areas of the Superior National Forest in accordance with the different approaches discussed in the FEIS. Second, the Sierra Club contends that the FEIS is based on seriously flawed data about the roads and

trails within the Superior National Forest. On this second point, the Sierra Club makes the subsidiary argument that the Forest Service inadequately disclosed its methodology with respect to the roads-and-trails data.

## II. DISCUSSION

### A. Standard of Review

Because NEPA itself does not provide for judicial review, the Sierra Club's NEPA challenge arises, as a formal matter, under the Administrative Procedure Act ("APA"). *See Cent. S.D. Coop. Grazing Dist. v. Sec'y of the USDA*, 266 F.3d 889, 894 (8th Cir.2001). Under the APA, the Court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A); *see also Cent. S.D. Coop. Grazing Dist.*, 266 F.3d at 894. An agency's decision or action is arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A court's inquiry into the facts surrounding the agency's action or decision

---

**5.** The alternatives differ in the extent to which different activities, such as logging and hunting, would be allowed, and in the Forest Service's goals with respect to the forests' flora and fauna. *See* FEIS Summary at SUM–18 to –21 (AR 18031).

**6.** In addition to being on the optical disks filed by the government, the Sierra Club's

administrative notice of appeal is also filed as Exhibit B to its summary-judgment memorandum. Pl. Ex. B [Docket No. 121].

**7.** In addition to being on the optical disks filed by the government, the Forest Service's appeal decision is also filed as Exhibit D to the Sierra Club's summary-judgment memorandum. Pl. Ex. D [Docket No. 121].

must be "searching and careful," but "the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court may not substitute its judgment for that of the agency. *Id.* Further, when a dispute is primarily factual and "requires a high level of technical expertise," resolution of the dispute "is properly left to the informed discretion of the responsible federal agencies." *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); *see also Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1128 (8th Cir.1999).

### B. Law and Regulations Governing Forest Plans

As noted, NEPA (unlike NFMA) does not establish substantive rules about how national forests should be managed. Rather, NEPA's "mandate to the agencies is essentially procedural." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). In particular, 42 U.S.C. § 4332 requires that when an agency proposes to take a "major Federal action[ ] significantly affecting the quality of the human environment," the agency must prepare a "detailed statement" on, among other things, the proposed action's environmental impact, alternatives to the action, and any unavoidable environmental harm that would result from the action. 42 U.S.C. § 4332(2)(C). Such a statement has come to be known as an EIS.

■ NEPA's requirement that an agency prepare an EIS before taking a major action affecting the environment ensures that information about the action's environmental impact will be both considered by the agency and made available to the public. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). But NEPA does not prevent agencies from taking environmentally harmful action: "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.... NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 350–51, 109 S.Ct. 1835.

The type of agency review required in an EIS under NEPA has come to be called "hard look" review. As the Supreme Court said in *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* NEPA requires an agency to "take a 'hard look' at the environmental consequences before taking a major action." 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see also Friends of the Boundary Waters,* 164 F.3d at 1128 (quoting *Baltimore Gas* ).

The "hard look" review required of the Forest Service with respect to forest plans is also subject to various regulations. Regulations implementing NEPA have been promulgated by the Council on Environmental Quality and are found in parts 1500 through 1518 of Title 40 of the Code of Federal Regulations. *See* 43 F.R. 55990 (Nov. 28, 1978), codified as amended at 40 C.F.R. §§ 1500.1–1518.4.[8] Further, regulations with respect to NEPA, NFMA, and forest plans in particular are found in parts 215 through 220 of Title 36 of the Code of Federal Regulations.

The key substantive rule with respect to the adoption of forest plans, codified as part 219 of Title 36 of the Code of Federal Regulations, was originally promulgated in

---

**8.** References in the text to the Council on Environmental Quality's NEPA regulations are to the version of those regulations published in the July 1, 2008 edition of the Code of Federal Regulations.

1982. 47 F.R. 43026 (Sept. 30, 1982). This rule was significantly modified in November 2000. 65 F.R. 67514 (Nov. 9, 2000) (revising 36 C.F.R. part 219 and removing 36 C.F.R. part 217).[9] The process of revising the forest plan for the Superior National Forest thus began when the 1982 forest-planning rule was in effect, but was still in process when that rule was superseded in November 2000. The Forest Service elected to complete this revision process under the 1982 rule. Forest Plan at 1–4 ("The 2004 Forest Plan revision process was conducted under the 1982 version of the Forest Service planning rules as stated in CFR § 219."); *see also* 36 C.F.R. § 219.35 (July 1, 2001) (allowing plan revisions started under the 1982 rule to be completed under them). Therefore, unless otherwise indicated, references in this opinion to regulations in Title 36 of the Code of Federal Regulations are to the 1982 forest-planning rule and related rules, as last set forth in the July 1, 2000 edition of the Code of Federal Regulations.

The question in this case is whether, in light of NEPA and the relevant regulations, the Forest Service took a sufficiently hard look at the environmental consequences in the July 2004 FEIS that accompanied the agency's adoption of the revised forest plan for the Superior National Forest. Put another way, the question is: Did the Forest Service take such an "easy look" at the environmental consequences of managing the forest in accordance with the new forest plan that the agency acted arbitrarily and capriciously in adopting the plan? If so, then the Forest Service's action must be set aside under the APA.

As noted, the Sierra Club identifies two areas in which the FEIS for the forest plan is allegedly so deficient that the FEIS does not satisfy NEPA's requirements: consideration of effects on the BWCAW, and use of data about roads and trails. The Court addresses each issue in turn.

### C. Boundary Waters Canoe Area Wilderness

The Sierra Club contends that the Forest Service abused its discretion by adopting the revised forest plan despite having failed to consider in the FEIS the impact on the BWCAW of managing the Superior National Forest in accordance with that plan. Pl. Mem. Supp. Mot. S.J. ("Pl. SJ Mem.") at 14–24 [Docket No. 120]. The Sierra Club emphasizes that the BWCAW is a unique, pristine wilderness area that Congress has specially designated for protection in two statutes, the Wilderness Act, Pub. L. 88–577, 78 Stat. 890 (1964) (codified as amended at 16 U.S.C. §§ 1131–36) and the Boundary Waters Canoe Area Wilderness Act, Pub. L. 95–495, 92 Stat. 1649 (1978) (amending the Wilderness Act). Pl.

9. Whereas 36 C.F.R. part 219 has always governed the adoption of forest plans, 36 C.F.R. part 217 formerly governed *appeals* with respect to the adoption of forest plans. Part 217 was originally promulgated in 1989. 54 F.R. 3342, 3357 (Jan. 23, 1989). Under the revised regulations adopted in November 2000, part 217 is omitted, and appeals of forest-plan adoption are governed by § 219.32, a section within part 219. 65 F.R. 67514 (Nov. 9, 2000) (revising 36 C.F.R. part 219 and removing 36 C.F.R. part 217). In January 2001, the Forest Service adopted an interpretive rule explaining that if the Forest Service chooses to revise a forest plan under the 1982 version of part 219, the appeals process set forth in the pre–2000 version of part 217 will govern related appeals. 66 F.R. 1864 (Jan. 10, 2001); 36 C.F.R. § 219.35 App. A (July 1, 2001).

In January 2005, the Forest Service again revised 36 C.F.R. part 219. 70 F.R. 1022 (Jan. 5, 2005) (removing former part 219); 70 F.R. 1023 (Jan. 5, 2005) (adopting new part 219). Under the new regulations, the appeal process with respect to forest plans is set forth in 36 C.F.R. § 219.13. 70 F.R. 1023, 1059–60. Because the forest plan for the Superior National Forest was adopted in 2004, the 2005 regulations are not at issue in this case.

SJ Mem. at 16–17. Accordingly, says the Sierra Club, the FEIS for the forest plan should have given more attention to the BWCAW.

The Forest Service and the MTPA respond that the FEIS for the forest plan does, in fact, adequately consider effects on the BWCAW. Fed. Def. Mem. Supp. Mot. S.J. & Opp. Pl. Mot. S.J. ("Gov't SJ Mem.") at 13–24 [Docket No. 140]; Interv. Mem. Supp. Cross–Mot. S.J. & Opp. Pl. Mot. S.J. ("MTPA SJ Mem.") at 10–14 [Docket No. 136]. Specifically, the Forest Service contends that because the forest plan is a programmatic document that does not authorize site-specific activities, the FEIS for the plan was not required to assess the plan's effects on the BWCAW in detail. Gov't SJ Mem. at 13–18. Instead, effects on the BWCAW of managing the Superior National Forest in accordance with the forest plan will be given detailed consideration in future EISes that will be issued in connection with site-specific actions. *Id.* at 17 ("As site-specific projects are proposed, additional NEPA analysis will be conducted as appropriate.").

■ The Court agrees with the Sierra Club that the Forest Service, in the FEIS for the forest plan, is required under NEPA to consider how the BWCAW would be affected by the alternative forest-management approaches discussed in the FEIS. Under the Council on Environmental Quality's NEPA regulations, assessing whether a federal action "significantly" affects the environment "requires considerations of both context and intensity[.]" 40 C.F.R. § 1508.27. And in considering the

"intensity" of the effects of a proposed action, an agency must consider, among other things, "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 40 C.F.R. § 1508.27(b)(3). The BWCAW is a unique geographic area that merits special consideration under NEPA.

■ But to say that the FEIS for the forest plan must reflect consideration by the Forest Service of impacts on the BWCAW leaves open a more difficult question: What, exactly, would sufficient consideration of such effects look like in an EIS for a programmatic document like a forest plan?

If the Forest Service proposed a site-specific action such as the clearcutting of forest directly adjacent to the BWCAW, the action's impacts on the BWCAW could be—and would have to be—identified and assessed. *See Sierra Club Northstar Chapter v. Kimbell,* No. 07–3160, 2008 WL 4287424, at *5 (D.Minn. Sept. 15, 2008) (holding that in evaluating the impact of a proposed site-specific project in the Echo Trail area of the Superior National Forest, "[b]y failing to consider the Project's impacts on the water quality and watershed health of the Boundary Waters, the Forest Service failed to conduct the 'hard look' analysis required by NEPA."). But the direction in the forest plan is much more general. It makes sense, then, that the EIS for the forest plan should assess the plan's effects on the BWCAW at a similarly general level.[10]

---

**10.** *See, e.g., 'Ilio'ulaokalani Coalition v. Rumsfeld,* 464 F.3d 1083, 1095–96 (9th Cir.2006) (discussing the level of detail required in programmatic and site-specific EISes); *Nevada v. Dep't of Energy,* 457 F.3d 78, 93 (D.C.Cir. 2006) (rejecting challenge to a programmatic EIS); *Friends of Yosemite Valley v. Norton,* 348 F.3d 789, 800 (9th Cir.2003) ("An EIS for a programmatic plan ... must provide suffi-

cient detail to foster informed decision-making, but site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development.") (quotations omitted); *Seattle Audubon Soc'y v. Lyons,* 871 F.Supp. 1291, 1324 (W.D.Wash. 1994) ("The analyses are general due to the programmatic nature of the FSEIS. The dis-

That said, considering the effects of a new forest plan on the BWCAW, even at a general level, is quite different from—indeed, is the *opposite* of—totting up how many acres of different types of trees the BWCAW contributes to the Superior National Forest as a whole. Yet much of the FEIS's discussion of the BWCAW amounts to doing just this—to considering the BWCAW as an *input* to the forest, rather than considering how the BWCAW will be *affected* by management of the surrounding areas.[11] To the extent that the Forest Service contends that such consideration of the BWCAW as an input satisfies NEPA's requirement that the Forest Service consider the effects on the BWCAW of managing the forest in accordance with the forest plan, the Forest Service is plainly mistaken.

The FEIS for the forest plan does, however, clearly set forth a policy that the Forest Service's management of the Superior National Forest as a whole is intended to be neutral with respect to the BWCAW. For example, the FEIS repeatedly states that the BWCAW will be managed in accordance with a separate BWCAW-specific management plan adopted in August 1993. *E.g.*, FEIS at 1–28 ("The 1986 Superior Forest Plan was amended in August 1993 to update management direction for the [BWCAW].... [T]he Forest Plan revision process will not revisit this decision but will instead carry forward the 1993 Forest Plan amendment as management direction for the BWCAW."). And both the FEIS and the ROD say in many places that the revised forest plan does not change the Forest Service's management direction for the BWCAW. *E.g.*, ROD at 35 ("The Revised Plan makes no changes to management direction for the [BWCAW]...."); FEIS at 1–32 ("No decisions were made that affected current management of the BWCAW."); FEIS Summary at SUM–1.

Further, with respect to several particular issues, the FEIS does expressly consider the effects on the BWCAW of alternative management plans for the Superior National Forest. For instance, the ROD says that the Forest Service determined that various roadless areas did not "enhance[ ] or contribute[ ] extraordinary character to the BWCAW" and did not "add significantly to the recreational opportunities of the [BWCAW]." ROD at 17. And in considering the effects of alternative management approaches on so-called Management Indicator Habitats, the FEIS says that "[t]he effects inside the BWCAW would be the same in each of the alternatives." FEIS at 3.3.1–50. Likewise, the FEIS asserts that under all of the alternative management approaches under consideration, habitat within the BWCAW for various species would be unaffected.[12]

cussion complies with NEPA and the regulations.").

11. *See, e.g.*, ROD at 3 ("The [BWCAW] will continue to contribute to the ecological integrity of the Superior National Forest in terms of vegetative communities, old growth, and species habitat."), 9 ("The [BWCAW] ... and areas not suited for timber production were also considered for their contribution when determining the vegetative objectives for older trees and old growth."); FEIS at 2–12 ("Some of the extended rotation stands on the ... BWCAW ... would also contribute old-growth forest."), 3.2–51 ("The contribution of the BWCAW on the Superior [National Forest] is accounted for in forest-wide line totals for mature forest patches (table FSP–2) for maximum potential, existing conditions, and indicator decadal totals.... A large proportion of the BWCAW is in mature forest and contributes a large amount of interior forest available within the Superior.").

12. *See* FEIS at 3.3.4–8 ("The quality, quantity, and distribution of lynx foraging and denning habitat, connectivity, and human uses in the BWCAW is not significantly influenced by the proposed actions of the Revised Plans since no change to BWCAW management direction is proposed."), 3.3.4–23 ("[T]he potential for impacts to wolves within the BWCAW would not vary by alternative."), 3.3.4–37 ("On the Superior [National Forest], the po-

And in considering whether to designate additional areas as wilderness, the FEIS notes that under one alternative approach, adding certain areas would "provide more capacity and help alleviate congestion in the BWCAW." FEIS at 3.7–11.

■ Although the statements in the FEIS about effects on the BWCAW are somewhat conclusory, they demonstrate that the Forest Service did consider such effects. In a site-specific plan, such conclusory statements would not pass muster, as an EIS must provide reasons supporting its analysis, not just conclusions. *See, e.g., Envtl. Def. Fund, Inc. v. Froehlke*, 473 F.2d 346, 351 (8th Cir.1972) (holding that an EIS "must contain more than a catalog of environmental facts, however. The agency must also explicate fully its course of inquiry, its analysis and its reasoning.") (quotations omitted); *see also Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 77 (D.C.Cir.2006) (holding that under the APA, "an agency action must be supported by reasoned decisionmaking") (quotations omitted). Significantly, however, the FEIS itself recognizes that further site-specific analysis may be necessary to ensure that the BWCAW is not harmed by particular activities in the surrounding forest. The FEIS observes that under "modified Alternative E"—the management approach ultimately selected in the ROD—"it is likely that there will be less connectivity of habitats between those found in the BWCAW and those found" elsewhere in the forest. FEIS at 3.2–60 to –61 (citation omitted). The FEIS then observes: "Site specific analysis could consider the issue of connectivity and, through thoughtful management, could mitigate impacts to connectivity in Zone 3 [i.e., the area surrounding

and including the BWCAW]." *Id.* at 3.2–61.

The Court finds that the FEIS, taken as a whole and given the programmatic nature of the forest plan, adequately considers how the BWCAW would be affected by the different management approaches under consideration. The FEIS and the forest plan both convey a clear intention on the part of the Forest Service to manage the surrounding forest in a way that is neutral with respect to the BWCAW. Subsequent site-specific actions will need to be consistent with the forest plan—that is, consistent with the goal of having a neutral impact on the BWCAW—and in preparing EISes for such site-specific actions, the Forest Service will need to consider whether and how such proposed actions will affect the BWCAW. *See Sierra Club Northstar Chapter*, 2008 WL 4287424, at *5. But the Forest Service has not acted arbitrarily and capriciously by setting a general policy of neutrality toward the BWCAW in the FEIS and revised forest plan and discussing in the FEIS, at a general level, the possible effects on the BWCAW of the alternative management approaches under consideration.

### D. Roads and Trails—Accuracy

The Sierra Club contends that the FEIS for the revised forest plan is hopelessly flawed because the Forest Service relied on inaccurate data about the roads and trails in the forest. Pl. SJ Mem. at 25–33. To support this contention, the Sierra Club relies primarily on a report that it commissioned from the Pacific Biodiversity Institute ("PBI") and submitted to the Forest Service in November 2004 in connection with the Sierra Club's appeal of the June

---

tential for pine replacement in the BWCAW in stands of all ages would remain the same under all alternatives as analyzed in the [BWCAW] Fuel Treatment Final EIS (USDA

2001a)."), 3.3.6–18 ("The effects to white pine in the [BWCAW] will not vary by alternative."), 3.3.6–29 ("Habitat for deer will not vary by alternative in the BWCAW.").

2004 adoption of the forest plan. Pl. Ex. L.

The government raises what could be called an issue-preservation or issue-exhaustion defense: It contends that the roads-and-trails issue is not properly before the Court because the Sierra Club failed to raise it with the Forest Service during the comment period on the draft EIS. Gov't SJ Mem. at 25–26. Intervenor MTPA and amicus curiae the Ruffed Grouse Society make a related but slightly different argument, contending that the PBI report is not properly part of the record before this Court. MTPA SJ Mem. at 8, 17; Ruffed Grouse Soc'y Amicus Br. at 8–9. The government also contends, on the merits, that the roads-and-trails data relied upon by the Forest Service was adequate under the circumstances. Gov't SJ Mem. at 26–32. The Court addresses the two procedural arguments before turning to the merits.

### 1. Procedural Arguments

#### a. Issue Exhaustion

■■■ As a general rule, parties challenging agency action under NEPA must "structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position and contentions." *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). It follows that when a party challenges agency action in litigation based on an issue that the party never raised before the agency, courts will generally not consider such a challenge. *See, e.g., Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); *Sears, Roebuck & Co. v. Fed. Trade Comm'n*, 676 F.2d 385, 398 (9th Cir.1982) (refusing to consider theories that "appear[ed] in the litigation for the first time on ... appeal").

■■■ But it is one thing for a court to refuse to consider an issue that was never presented to an agency. It is quite another for a court to refuse to consider an issue that was raised before the agency at some point (in this case, during the administrative appeal of the decision to adopt the forest plan) but may not have been raised at the earliest possible moment (in this case, during the earlier comment period). The government contends that under *Department of Transportation v. Public Citizen*, Sierra Club forfeited its roads-and-trails argument by failing to raise it during the comment period. Gov't SJ Mem. at 25–26. But the government's reliance on *Public Citizen* is misplaced. In *Public Citizen*, unlike in this case, the comment period was the only opportunity for the party who challenged the agency action under consideration (an Environmental Assessment) to raise its concerns. By failing to raise its concerns during the comment period, the challenger in *Public Citizen* deprived the Department of Transportation of *any* opportunity to consider the issue that the challenger later sought to raise in litigation. *See Public Citizen*, 541 U.S. at 764, 124 S.Ct. 2204 ("Because respondents did not raise these particular objections to the [Environmental Assessment], [the agency] was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available.").

Significantly, during the agency proceedings in this case, the Forest Service never made the argument that it now advances. The Sierra Club asserted in its administrative appeal of the forest plan's adoption that the Forest Service "[was] grossly failing in its obligation to maintain accurate maps and data on its extensive road and trail system...." Notice of Appeal, Nov. 26, 2004—Statement of Reasons at 15. The Forest Service rejected this contention on the merits without ever sug-

gesting that, because the Sierra Club had not raised the argument during the earlier comment period, it was somehow untimely. *See* Appeal Decision, Aug. 8, 2005, at 63–64; Appeal 05–13–00–0032 Record Citations at 27–28 (AR 22001).[13]

In considering the Sierra Club's roads-and-trails argument on the merits during the administrative appeal, the Forest Service acted consistently with the relevant regulations. Those regulations provide two opportunities for public participation with respect to a forest plan: the comment period before the plan's adoption, governed by 36 C.F.R. § 219.6, and the appeal period following the plan's adoption, governed by 36 C.F.R. part 217.[14]

Subpart (b) of § 219.6 provides in part that "[p]ublic comments shall be analyzed according to NEPA procedures." 36 C.F.R. § 219.6(b). The cross-referenced NEPA procedures about public comments are found in part 1503 of Title 40 of the Code of Federal Regulations. Section 1503.1(a)(4) requires an agency to "[r]equest comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected." 40 C.F.R. § 1503.1(a)(4). And § 1503.3(a) requires that comments be "as specific as possible . . . ." 40 C.F.R. § 1503.3(a). But nothing in either 40 C.F.R. part 1503 or 36 C.F.R. part 219 says that the Forest Service should refuse to consider, in an administrative appeal, issues that were not raised during an earlier comment period.

More important, the regulations governing administrative appeals with respect to forest plans do not limit the issues on appeal to issues that were raised during an earlier comment period. Under 36 C.F.R. § 217.9(b), a notice of appeal must, among other things, "[i]dentify the decision" being challenged, "[i]dentify specifically that portion of the decision or decision document" being challenged, and "[s]tate the reasons for objecting, including issues of fact, law, regulation, or policy, and, if applicable, specifically how the decision violates law, regulation, or policy . . . ." 36 C.F.R. § 217.9(b). Nothing in § 217.9 requires an appellant to state in the notice of appeal that the points being made on appeal were raised during an earlier comment period.

If such an issue-exhaustion requirement existed for administrative appeals of forest plans, it would be found in 36 C.F.R. § 217.11, which directs the Forest Service to dismiss certain appeals "and close the appeal record without decision on the merits . . . ." 36 C.F.R. § 217.11(a). Reasons for such dismissal include, among other things, an appellant's failure to file a timely notice of appeal, her filing of an inadequate notice of appeal (i.e., one that fails to comply with the requirements of § 217.9, discussed above), and her requesting relief that "cannot be granted under law, fact, or regulation existing when the decision was made." *Id.* Conspicuously absent from this list of reasons is the appellant's failure to raise the issue during an earlier comment period.

These requirements for appeals with respect to forest plans differ sharply from

---

**13.** During the administrative appeal, the Forest Service considered the *issue* raised by the Sierra Club with respect to data about roads and trails. Whether the Forest Service did consider, or should have considered, the *evidence* submitted by the Sierra Club—i.e., the PBI report—is a separate question that is addressed below.

**14.** As already noted, unless otherwise indicated, citations to regulations in Title 36 of the Code of Federal Regulations are to the July 1, 2000 edition of the code, which sets out, with only slight modifications, the 1982 forest-planning regulation.

the regulations governing appeals of site-specific actions found in part 215 of chapter 36 of the Code of Federal Regulations. Section 215.11(a) provides that only parties who have submitted comments may file appeals with respect to site-specific actions. 36 C.F.R. §§ 215.11(a)-(b), 215.13(e). By contrast, "any person" may file an appeal with respect to a forest plan under § 217.6, not just persons who earlier submitted comments. 36 C.F.R. § 217.6(a). If appellants could raise in forest-plan appeals only issues that they had first raised during a comment period, it would make little sense to allow appeals by parties who had never filed comments.

In sum, the government is asking the Court to impose an issue-exhaustion requirement for forest plans that goes further than the Forest Service's own regulations. The Supreme Court held in *Sims v. Apfel* that "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." 530 U.S. 103, 109, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). The process of adopting a forest plan is not adversarial, but inquisitorial. The Forest Service's goal is to serve the public interest based on the best available information in light of the agency's policy preferences. When "an administrative proceeding is not adversarial, ... the reasons for a court to require issue exhaustion are much weaker." *Id.* at 110, 120 S.Ct. 2080. The Court therefore finds that even if the Sierra Club failed to challenge the quality of the Forest Service's roads-and-trails data during the comment period—something the Court assumes without deciding—the Sierra Club

sufficiently exhausted its remedies with respect to that issue when it raised it during the appeal period.

### b. Scope of the Record

■ It is black-letter law that judicial review under the APA is generally confined to the administrative record that was before the agency when it made the decision being challenged. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *see also Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir.2004) (citing *Overton Park*). Only under "extraordinary circumstances" will a reviewing court allow a party to introduce evidence in litigation that was not part of the administrative record. *Voyageurs Nat'l Park Ass'n*, 381 F.3d at 766.

■ The Sierra Club does not dispute these general principles. Nor does the Sierra Club argue that extraordinary circumstances would justify considering the PBI report if that report is outside of the administrative record. Rather, the Sierra Club contends that the PBI report is part of the administrative record because it was submitted during the administrative appeal. Pl. Mem. Opp. Fed. Def. & Interv. Cross–Mots. S.J. ("Pl. SJ Opp.") at 12–15 [Docket No. 146]. For its part, intervenor MTPA agrees with the Sierra Club that the administrative record is limited to the material before the Forest Service when it made its final decision, but MTPA asserts that the PBI report was submitted "after the final agency decision" and is therefore untimely.[15] MTPA SJ Mem. at 9.

MTPA simply assumes that the relevant final decision in this case was the Forest Service's adoption of the forest plan in

---

**15.** Amicus curiae the Ruffed Grouse Society likewise argues that the PBI report is untimely and should not be considered. Ruffed Grouse Soc'y Amicus Br. at 8–9. But the Ruffed Grouse Society does not cite a single

case, statute, or regulation to support this argument. The Court will therefore not discuss the Ruffed Grouse Society's argument further.

June 2004, rather than the conclusion of the subsequent appeal process. This is a reasonable position—after all, the Forest Service issued a document called a "Record of Decision" in connection with its adoption of the forest plan. Yet the governing Forest Service regulations expressly provide an opportunity for parties to challenge that decision through an administrative appeal, and it is certainly arguable—at least in the abstract—that the Forest Service's decision was not final (and the administrative record was not closed) until the appeal process ended.

The Court has found no case law addressing whether, with respect to a forest plan, the final decision that marks the close of the administrative record is the Forest Service's adoption of a plan through a "Record of Decision" or the resolution of any subsequent appeal. Two cases cited by the Sierra Club *imply* that materials submitted during an administrative appeal become part of the administrative record—that is, that the relevant final decision is the resolution of the appeal—but neither case decides the question (or even gives it serious consideration).[16]

Apart from this scant and unconvincing case law, the Sierra Club relies on Forest Service regulations to support its argument that the PBI report is part of the administrative record. The Court agrees with the Sierra Club that the question of the administrative record's contents is resolved by Forest Service regulations—but not by the regulations cited by the Sierra Club, and not in the Sierra Club's favor.

Inexplicably, the Sierra Club relies on regulations in part 215 of Title 36 of the Code of Federal Regulations to support its argument that the PBI report is part of the administrative record. Pl. SJ Opp. at 13. According to the Sierra Club, those regulations establish that "the Forest Service's adoption of the Forest Plan did not become final until after the administrative appeals process ended" and that, accordingly, "materials submitted to the Forest Service during the appeal—including the PBI Report—... are necessarily part of the administrative record...." *Id.* (citing 36 C.F.R. §§ 215.18, 215.2).

But the regulations in part 215 (titled "Notice, Comment, and Appeal Procedures for National Forest System Projects and Activities") apply only to *site-specific* activities, not to the adoption of forest plans. Under 36 C.F.R. § 215.3, the notice-and-comment procedures described in part 215 apply to, among other things, "[p]roposed actions *implementing* national forest land and resource management plans" and "[n]onsignificant amendments" to such a plan "that are included as part of a decision" on a proposed action implementing the plan. 36 C.F.R. § 215.3(a), (c) (emphasis added). And 36 C.F.R. § 215.4(e) provides that part 215 *does not apply* to "[a] nonsignificant amendment to a land and resource management plan which is made separately from a proposed action specified in § 215.3(c) [i.e., an action implementing a forest plan] and which, therefore, is subject to appeal under part 217 of [C.F.R. Chapter 36]." 36 C.F.R. § 215.4(e).

**16.** *See Wilderness Soc'y v. Dombeck,* 168 F.3d 367, 377 (9th Cir.1999) (affirming district court's refusal to admit as evidence declarations offered in litigation, saying: "Because the Goerold declarations were not submitted during the Forest Service's administrative appeals process, the district court did not abuse its discretion in refusing to make them a part of the record here."); *Inland Empire Pub. Lands Council v. Schultz,* 807 F.Supp. 649, 650 (E.D.Wash.1992) (granting the Forest Service's motion to limit judicial review to "the administrative record which documents the creation of the [Forest] Plan and the subsequent unsuccessful administrative appeal").

As the language just quoted makes plain, it is part 217 of Title 36 (titled "Appeal of Regional Guides and National Forest Land and Resource Management Plans") that governs appeals with respect to forest plans adopted pursuant to the 1982 forest-planning rule.[17] And 36 C.F.R. § 217.15 (titled "Appeal record") specifies what the appeal record includes. Subsection (c) of § 217.15 provides:

> The review of decisions appealed under this part focuses on the documentation developed by the Deciding Officer in reaching decisions. The record[ ] on which the Reviewing Officer shall conduct the review consists of the notice of appeal, any written comments submitted by intervenors, the official documentation prepared by the Deciding Officer in the decisionmaking process, the Deciding Officer's letter transmitting those documents to the Reviewing Officer, and any appeal related correspondence, including additional information requested by the Reviewing Officer pursuant to § 217.13 of this part.

36 C.F.R. § 217.15(c).

Section 217.15(c) describes two categories of documents: those on which review "focuses," and those that make up "[t]he record[ ] on which the Reviewing Officer shall conduct the review...." *Id.* There is no dispute that in this case, the PBI report was not part of "the official documentation prepared by the Deciding Officer in the decisionmaking process." Accordingly, the PBI report is not part of the documentation on which an appeal of a forest-plan revision "focuses" under part 217.

But aside from the documentation on which the administrative appeal focuses, the appeal record includes several other things: the notice of appeal, the written comments of intervenors, a transmittal letter, appeal-related correspondence, and additional information (if any) requested by the agency official deciding the appeal. *Id.* The Forest Service did not request the PBI report, and the report was submitted by the appellant (the Sierra Club) rather than an intervenor, so it belongs in the appeal record under § 217.15(c) only if it qualifies as part of the notice of appeal or as appeal-related correspondence.

The Court finds that the term "appeal related correspondence" should be interpreted fairly narrowly. In particular, "appeal related correspondence" does not mean "all information sent to the agency during the appeal process," but rather correspondence about the appeal *itself*. To interpret the term more broadly would be inconsistent with the basic tenor of § 217.15(c), whose purpose is to set limits on the content of the record on appeal. In other words, to interpret the term more broadly would permit parties an unlimited opportunity to expand the record on appeal by dumping in anything and everything that might aid their cause. Section 217.15(c) is clearly not intended to extend such an open invitation.

The only question, then, is whether the PBI report could be considered part of the "notice of appeal." The content of the notice of appeal is defined in 36 C.F.R. § 217.9. Subpart (a) of § 217.9 requires a party who appeals a Forest Service decision to provide in the notice of appeal "sufficient narrative evidence and argument to show why the decision by the lower level officer should be changed or reversed." 36 C.F.R. § 217.9(a). Subpart (b)(6) further specifies that a notice of appeal must "[s]tate the reasons for

---

17. Likewise, the appeal decision issued by the Forest Service in August 2005 makes plain that the appeal was governed by 36 C.F.R. part 217. Appeal Decision, Aug. 8, 2005, at 1 ("A total of 14 individual appeals were submitted under 36 CFR 217. Two appeals were dismissed for not filing in accordance with 36 CFR 217.").

objecting, including issues of fact, law, regulation, or policy, and, if applicable, specifically how the decision violates law, regulation, or policy...." 36 C.F.R. § 217.9(b)(6).

Although the regulations do not further define the phrase "narrative evidence" as used in § 217.9(a), the Court does not believe that the phrase includes things like the PBI report. Rather, "narrative evidence" in this context must mean a narrative description of the evidence already in the record that supports the appellant's position. (After all, "narrative evidence" must be something other than simple "evidence.") While the PBI report may be "evidence" that supports the Sierra Club's position, it is not "narrative evidence." Accordingly, although the Sierra Club attached the PBI report as an exhibit to the statement of reasons accompanying its notice of appeal, the Court finds that the report is not part of the appeal record under 36 C.F.R. § 217.15, and therefore is not part of the administrative record to be reviewed by the Court.[18]

It also follows that the Forest Service was not required to respond during the appeal to the specific information found in the PBI report, given that the report was not part of the administrative record. The Court therefore rejects the Sierra Club's argument that the Forest Service violated NEPA by failing to address directly the PBI report's conclusions. Pl. SJ Mem. at 37 ("In this case, the Forest Service violated NEPA when it failed to respond to the PBI Report submitted as part of the Administrative Appeal.").

### 2. Merits of Challenge to Roads–and–Trails Data

 The Court now turns to the merits of the Sierra Club's argument that the Forest Service relied on such flawed roads-and-trails data that it acted arbitrarily and capriciously in adopting the revised forest plan. Given the parties' scant briefing and the lack of case law with respect to whether the PBI report is properly part of the administrative record, the Court recognizes that its decision with respect to the scope of the administrative record is not free from doubt. Thus, for the sake of completeness, the Court will first address the Sierra Club's roads-and-trails claim without considering the PBI report, and then the Court will address that same claim in light of the PBI report.

### a. Claim Without PBI Report

Appendix F of the FEIS is devoted entirely to discussing the road systems in the Chippewa and Superior National Forests. FEIS App. F ("Transportation System") (AR 18029). That document explains that the road data on which the FEIS was based came from a "road atlas" maintained by the Forest Service for each forest. *Id.* at F–18. The road atlas, in turn, has two components: (1) a "tabular database" of the road system—that is, a list of roads and associated information; and (2) a "spatial inventory" of the road system—that is, a map. *Id.* The list portion of the atlas is stored in a computer program known as INFRA Travel Routes. The map portion of the atlas is known as the GIS Roads

---

**18.** The Court's interpretation of the scope of the appeal record is consistent with the interpretation apparently relied on by the Forest Service in the administrative proceedings underlying this case. In the transmittal memorandum accompanying its decision on the Sierra Club's appeal, the Forest Service described the appeal record this way: "The Appeal Record is simply a *subset* of the For-

est Plan revision Planning Record." Mem. of Paul L. Momper to Dale Bosworth, Mar. 14, 2005 at 1 (AR 22000, file "Duncan Sierra Club SNF # 05–13–00–0032.doc") (emphasis added). It follows that substantive evidence can only be introduced as part of the planning record—i.e., during the comment period—and not as part of an appeal.

Layer ("GIS" stands for "geographic information system" and indicates that the map is computer-based). *Id.* The two sets of data (the list and the map) are linked together so that the Forest Service can analyze data about roads in a specific area. The particular data used by the Forest Service in developing the forest plan came from the October 2002 version of INFRA Travel Routes. *Id.* at Tables F–2, F–8 to F–13; FEIS App. J. (AR 18030) at J–296 (response to public comment).

The Forest Service is required by 36 C.F.R. part 212 to manage roads within national forests. Since at least 2001, under 36 C.F.R. § 212.2, the Forest Service has been required to maintain a "forest transportation atlas" for each national forest. 36 C.F.R. § 212.2 (July 1, 2001).[19] Section 212.2 recognizes that the atlas "is a dynamic document that changes in response to new information on the existence and condition of roads, trails, and airfields of the unit." *Id.* Section 7711.03 of the Forest Service Manual further specifies how the atlas should be maintained and directs the Forest Service to:

> Maintain a current record of forest transportation facilities in the atlas. Use the ongoing real property and condition survey updates (FSM 6446) as appropriate. Use the Forest Service Infrastructure (Infra) database and the transportation layer of the geographic information system (GIS) for the storage and analysis of information in the transportation atlas. All spatial data must be compliant with national standards in conformance with Office of Management and Budget (OMB) Circular A–16 and

Executive Order 12906, which sets out the current Federal Geographic Data Committee (FGDC) Standard.

Forest Service Manual § 7711.03 (Dec. 16, 2003).[20]

On matters within an agency's expertise, reviewing courts must "defer to [an] agency's choice of methodology as long as it is not arbitrary or without foundation." *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1130 (8th Cir.1999); *see also Hells Canyon Alliance v. U.S. Forest Serv.,* 227 F.3d 1170, 1177 (9th Cir.2000) ("We also review the sufficiency of an agency's methodology under a rule of reason."). In particular, under NEPA, the Court need not decide whether an EIS is based on the best available scientific methodology. *Friends of the Boundary Waters Wilderness,* 164 F.3d at 1130.

The Forest Service's methodology for assessing and inventorying the roads and trails within the Superior National Forest is neither arbitrary nor without foundation. Particularly when the PBI report is set aside, the Court has no reason to doubt either the accuracy of the data for the Superior National Forest found in the Forest Service's INFRA database and GIS system, or the efficacy of the methods used to collect that data. The Forest Service itself acknowledged, in responding to the Sierra Club's appeal, that its roads-and-trails data "inherently does not always represent existing conditions" because those conditions change almost constantly. Appeal Decision, Aug. 8, 2005 at 64. But this is not a reason for the Court to sec-

---

**19.** Section 212.2 was amended in 2005, but it still seems to require the Forest Service to maintain a forest transportation atlas. *See* 70 F.R. 68288, Nov. 9, 2005 (amending 36 C.F.R. part 212). None of the parties has discussed whether the changes in § 212.2 have any effect in this case, and the Court assumes that they do not.

**20.** Chapters 7710 to 7713 of the Forest Service Manual are available on the Internet as the file "7710.doc" at http://www.fs.fed.us/cgi-bin/Directives/get_dirs/fsm?7700 (last visited Dec. 8, 2008).

ond-guess the Forest Service's reliance on that data, which it characterized as "the best available data." *Id.*

### b. Claim With PBI Report

The Sierra Club argues that the PBI report demonstrates the woeful inadequacy of the roads-and-trails data on which the Forest Service relied in preparing the FEIS. For several reasons, the Court disagrees.

As an initial matter, the Sierra Club contends that the PBI report is more accurate than the Forest Service's data because while the Forest Service used INFRA data from 2002, PBI used INFRA data available in "Spring 2004, a few months before the Forest Service completed the Final EIS and adopted the Forest Plan." Pl. SJ Mem. at 31. But this cuts *against* relying on the PBI report. As the Supreme Court observed in *Interstate Commerce Commission v. City of Jersey City*:

> Administrative consideration of evidence ... always creates a gap between the time the record is closed and the time the administrative decision is promulgated. This is especially true if the issues are difficult, the evidence intricate, and the consideration of the case deliberate and careful. If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

322 U.S. 503, 514, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944); *see also Vt. Yankee*, 435 U.S. at 554–55, 98 S.Ct. 1197 (quoting this passage). The Forest Service spent years revising the challenged forest plan and developing the associated draft and final EISes. It is not reasonable to expect the Forest Service to revise its work yet again on the basis of data that became available only a few months before the FEIS was issued.

Further, the Sierra Club has not established that the differences between the PBI report and the Forest Service's data are meaningful. For instance, the Sierra Club asserts that although the Forest Service found that there were a total of 2,406 miles of classified roads of all types in the forest, the PBI report proves that this underestimates the amount of roads in the forest by 350 miles. Pl. SJ Mem. at 31–32. This may be true, but the Sierra Club has not explained why such an error—amounting to about fifteen percent of classified road mileage—is so significant that the Forest Service acted arbitrarily in relying on the erroneous number.

The Court does not doubt that the Forest Service's atlas of roads and trails in the Superior National Forest is inaccurate in some respects. Cartography is an inexact science, particularly with respect to remote and largely undeveloped areas such as national forests, and particularly when old roads and trails often grow over and new roads and trails often are created without the Forest Service's knowledge. But it is not the Court's place to require exactitude from federal agencies. *See Cent. S.D. Coop. Grazing Dist. v. Sec'y of the USDA*, 266 F.3d 889, 901 (8th Cir.2001) ("Our standard for agency action is not one of perfection, but whether the agency acted arbitrarily and capriciously."). The Forest Service did not act arbitrarily and capriciously in relying on 2002 INFRA and GIS data in developing the revised forest plan and the associated FEIS, even if data from 2004 is more accurate.

### E. Roads and Trails—Disclosure of Methodology

The Sierra Club also contends that even if the Forest Service relied on accurate data about roads and trails, it violated

NEPA by failing to adequately disclose the source of that data. Pl. SJ Mem. at 33–37. The government responds that it need not itemize within the EIS the underlying roads-and-trails data on which the government relied. Gov't SJ Mem. at 26–27. The Court agrees that the Forest Service adequately disclosed its methodology with respect to roads-and-trails data.

Appendix F of the FEIS, titled "Transportation System," discusses roads and trails within the Chippewa and Superior National Forests. It explains that the Forest Service relied on its roads atlases for the forests, and that the atlases are based on data in the INFRA Travel Routes database and the agency's GIS Roads Layer. App. F at F–18. Further, Appendix F notes that "[r]oad data is frequently updated in the Road Atlas, such as during and after project level planning or other inventory and analyses processes." *Id.*

■ There is no requirement that an EIS include all of the underlying data on which it is based. To the contrary: Under the Council on Environmental Quality's NEPA regulations, "[a]gencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action." 40 C.F.R. § 1502.21. There is no dispute that the INFRA and GIS data on which the Forest Service relied was available to the public; indeed, the PBI report itself was based on data "pulled from the INFRA database in Spring 2004." Pl. SJ Mem. at 12 n. 8. Further, the procedures followed by the Forest Service in compiling its transportation atlases for national forests are set forth in the Forest Service Manual. Forest Service Manual §§ 7711.03, 7711.1. The Forest Service's public disclosure of its INFRA and GIS data and its methodology as set forth in the Forest Service Manual was sufficient under NEPA.

### ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of plaintiffs for summary judgment [Docket No. 119] is DENIED.

2. The motion of intervenor defendants Minnesota Timber Producers Association and Minnesota Forest Industries, Inc., for summary judgment [Docket No. 134] is GRANTED.

3. The motion of defendants Abigail R. Kimbell and Edward T. Schafer for summary judgment [Docket No. 138] is GRANTED.

4. Plaintiffs' complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.